IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHANIE FAHNESTOCK, | : | 1:13-cv-1872 |
| | : | |
| Plaintiff, | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| CARLISLE REGIONAL MEDICAL | : | |
| CENTER, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

### April 28, 2015

Presently pending is Defendant's Motion for Summary Judgment in this Age Discrimination in Employment Act action alleging unlawful discharge.  (Doc. 37). For the reasons that follow, the Court will grant the Motion.

## I.    BACKGROUND

Defendant, Carlisle Regional Medical Center, hired Plaintiff, Stephanie Fahenstock on July 2, 1984.  (Doc. 38, ¶ 2).  During her term of employment, Plaintiff worked as an ultra sonographer and certified ultrasound technologist. (Doc. 1, ¶ 21).  Plaintiff worked virtually continuously for Defendant for almost 28 years, with the exception of a four-month period in 2001-02 during which she

worked for a mobile ultrasound company.  (Doc. 38, ¶¶ 10-14).[1]  Plaintiff was

terminated from her employment on April 30, 2012, according to Defendant,

because of unsatisfactory performance.  (Doc. 1, ¶ 19; Doc. 15, ¶ 19).  Plaintiff was

over 40 years-old at the time of her discharge.

Plaintiff's personnel file reflects various performance problems throughout

her tenure.  She received two Counseling Notifications in 1999, both based on

patient complaints regarding Plaintiff's demeanor, comments, and tone of voice.

(Doc. 38-3, p. 2; Doc. 38-4, p. 2).  She received a notification in 2007 for using

inappropriate language at the front desk while a patient was nearby.  (Doc. 38-7, p.

2).  In 2008, she was cited for failure to use the appropriate procedure when absent

from work and/or utilizing flex time.  (Doc. 38-8, p. 2).

There were multiple instances of corrective and disciplinary action against

Plaintiff in 2011.  At this time, Melissa Cooper was Plaintiff's direct supervisor,

and Jennifer Dorrough was the Director of the Radiology Department and

_____

[1] Plaintiff resigned her employment on October 19, 2001.  (Doc. 38-5, p. 2).  She was re-hired as a Medical Sonographer in the Ultrasound Department starting February 25, 2002.  (Doc. 38-6, p. 2).  Plaintiff represents, and Defendant does not dispute, that she was hired back with full seniority and benefits as if she had never left.  (Doc. 38, ¶ 12).

Upon her return, Plaintiff negotiated a part-time role, consisting of 32 hours per week (Doc. 1, ¶ 33), but complains that she often was forced to work additional hours (*id.* ¶¶ 37-38).  Plaintiff remarks that, despite working the additional hours, she still was responsible for more out-of-pocket costs to maintain her benefits than a full-time employee would contribute.  (*Id.* ¶ 38).

supervised Ms. Cooper.  (Doc. 38, ¶¶ 15, 24-25).  Plaintiff received an Associate

Disciplinary Action Plan (Verbal Warning) on January 6, 2011, for noncompliance

with hospital policy regarding requesting a sick day from work.  (Doc. 38-9, p. 2).

On May 12, 2011, she received an Associate Disciplinary Action Plan (Written

Warning) in light of a patient complaint.  (Doc. 38-10, p. 2).  The citation reflects

that a patient overheard Plaintiff commenting that the patient was at the wrong

facility for the patient's particular concern and should not be there.  (*Id.*).  The

Action Plan states that other staff members performed "a full service recovery . . .

for this patient" but that Plaintiff's comments were "inappropriate and gave the

patient the wrong impression of our services, dep[artment] and hosp[ital]."  (*Id.*).

The form describes that Plaintiff responded appropriately to the disciplinary action

and took responsibility for the patient error.  (*Id.*).

On June 16, 2011, another Associate Disciplinary Action Plan (Written

Warning) was issued, this time for substandard work.  (Doc. 38-11, p. 2).  The

report relates that Plaintiff placed a biopsy guide on a transducer incorrectly, which

resulted in a patient being stuck in the wrong location and could have harmed the

patient.  (*Id.*).[2]  Plaintiff's remarks printed on the form characterize the error as a

---

[2]  Plaintiff testified, however, that the doctor noticed that the guide was upside-down before inserting the needle into the patient's breast, and that the patient was never stuck in the wrong place.  (Doc. 43-3, p. 25).

"mistake" and suggest that she was having a "bad day" and that it would not happen again.  (*Id.*).

On November 23, 2011, Plaintiff received an Associate Corrective Action Plan, delineated as her Third Written Warning.  (Doc. 38-12, p. 2).  This citation described a number of performance concerns, including complaints from providers related to poor imaging and conveying results outside of scope; general customer service problems; and "multiple [quality assurance] errors," including an October endovaginal scan using poor imaging technique, a November ovarian scan where there was a worksheet error and an incorrect tissue measurement, and a November carotid scan involving erroneous documentation, *i.e.*, an incorrect ratio.  (*Id.*; Doc. 43-8, p. 12).

Plaintiff submitted a letter, dated February 20, 2012, responding to the November 23, 2011 Action Plan.  (Doc. 38-12, pp. 5-6).  Regarding the provider complaints, Plaintiff explained that the hospital acquired a new radiology group in July 2011 that has "high standards" and that it was "quiet [sic] an adjustment getting used to the new standards and protocols."  (*Id.* at p. 5).  She stated that all of the ultrasound technologists received additional training and noted that she discussed the issues with Ms. Dorrough and was confident that all problems were resolved.  (*Id.*).  With respect to the customer service concerns, Plaintiff remarked

4

that she also discussed these issues with Ms. Dorrough.  (*Id.*).  Plaintiff next addressed each quality assurance error in turn.  She stated that, after the poor endovaginal scan, she worked on her technique with Ms. Cooper in order to achieve the preferred images.  (*Id.*).  Plaintiff explained that the ovarian scan was performed by a student whom she was supervising, and she had permitted the student to fill out the correspondent worksheet.  (*Id.*).  Plaintiff stated that she had initially reviewed the student's work but failed to perform a final check, and that the student did not record all of the requisite measurements on the worksheet.  (*Id.*).  Lastly, Plaintiff explained that the carotid worksheet had been reformatted recently, moving the line for the ratio from the bottom to elsewhere on the page.  (*Id.*).  Plaintiff stated that "[i]n a hurry and out of habit" she incorrectly placed the ratio at the bottom.  (*Id.*).  Plaintiff closed the letter by expressing that she welcomes continued feedback and comments and looks forward to continuing to provide excellent radiologic service on behalf of Defendant.  (*Id.* at p. 6).

Meanwhile, Ms. Dorrough advised Leslie Shatto, Defendant's Human Resources Director, of Plaintiff's recent quality errors and customer service issues. In an email dated December 12, 2011, Ms. Dorrough recounted in detail the multiple recent quality errors, including that Plaintiff had released a patient with a low amniotic fluid index without consulting the radiology group or the attending

physician and that her poor imaging in that case led to emergency physician call, unnecessary hospitalization, and an additional doctor's appointment for the patient. (Doc. 38-13, p. 2).  On a different occasion, Plaintiff had told a patient that results of a scan were "normal" and permitted the patient to leave, again without consulting the radiology group or the attending physician.  (*Id.*).  Ms. Dorrough remarked that it was never appropriate for an ultrasound technologist to comment on the result of an ultrasound and that, in fact, the patient's findings were critical. (*Id.*).  The patient had to return to the hospital immediately and be admitted.  (*Id.*). The email also stated that Plaintiff's scanning was evaluated as sub-standard in a conference with the radiology medical director.  (*Id.*).  The radiologist commented that Plaintiff's "interest in learning . . . is something she has to want to do and want to fix" and they have not seen such initiative from her since the new radiology group came on board in July 2011.  (*Id.*).

Plaintiff received her annual written Performance Evaluation for 2011 on December 27, 2011.  (Doc. 38-14, pp. 2-6).  She received a total score of 62%.  (*Id.* at p. 2).  The evaluation contained 66 Job Functions/Performance Standards, each assessed on a scale of 1 to 5.  (*Id.*).[3]  Plaintiff scored 3s in the vast majority of

---

[3]  The Review Rating Scale was thus defined: "5 - consistently exceeds performance expectations of CRMC's value system; 4 - consistently meets & often exceeds performance expectations; 3 - effectively meets performance expectations; 2 - occasionally meets but often falls below performance expectations, needs improvement; 1 - does not meet performance

areas, and scored 2s or 2.5s on eight of the questions.  (*Id.* at pp. 2-4).  The

questions on which Plaintiff received a 2 or 2.5 are listed here, along with the

pertinent hand-written comments of the reviewer:

> 2.C.   Indicates to Radiologist any additional pathology
> noticed not pertaining to ultrasound exam, assuring
> quality patient care.  Comment: "continue to
> educate yourself to the exceptions to normal."
>
> 5.D   Instructs patients politely, concerning preps or
> exams and handles questions in a concerned
> manner.  Comment: "have seen major
> improvements here."
>
> 9.A   Meets customer needs and expectations in an
> ethical, proficient, competent and timely manner.
> Comment: "need to put the [patient's] needs first."
>
> 9.C   Provides timely and accurate information to the
> customer while protecting confidentiality.
> Comment: "'work in progress.'"
>
> 9.D   Provides a positive customer relation's role model
> to other members of the healthcare team.
>
> 10.A   Is knowledgeable and possesses the information
> and skills needed to perform the functions of this
> job.  Comment: "do your SDMS webinars to
> improve your skill set."
>
> 15.A   Produces an acceptable amount of high quality
> work.  Comment: "work in progress.  [Plaintiff] is
> showing much improvement and has taken all
> constructive criticism positively and is working
> hard to make changes to her daily work style."
>
> 15.B   Emphasizes quality work.  Comment: [same as
> comment at 15.A]

(Doc. 38-14, pp. 2-4).  The evaluation contained an additional hand-written

expectations and requires improvement to continue employment."  (Doc. 38-14, p. 2).

comment, noting that Plaintiff often arrives early to work. (*Id.* at p. 3). Plaintiff's reviewer identified goals for Plaintiff going forward, including showing a positive attitude toward work, focusing on attention to detail and quality of work, improving scanning proficiency, and "want[ing] to be a member of the team/organization and approach[ing] work everyday with a positive outlook." (*Id.* at p. 6 (emphasis in original)). Plaintiff also memorialized her own goals, stating that she wants to "show more compassion for the patients" and "make them feel more at ease during their procedures" and, also, to "slow down and not rush as much so the attention to detail is not overlooked." (*Id.*).

On April 18, 2012, a final Associate Disciplinary Action Plan was issued to Plaintiff, recording two quality assurance errors. (Doc. 38-15, p. 15). The action to be taken was indicated as Termination, effective April 30, 2012. (*Id.*). The citation alleged that, in one case, Plaintiff had mislabeled all images from a scan, and in the other case, Plaintiff had failed to note an irregular liver contour on the worksheet to the radiologist. (*Id.*).

Leslie Shatto sent an email to Amy Linsin, Regional Director of Human Resources, on April 25, 2012, with the subject "Termination Review." (Doc. 38-16, p. 2). The message stated that Plaintiff "has had many scanning issues which has [isc] been creating quality issues" and described the verbal warning of January

6, 2011, and the written warnings of May 12, 2011, June 16, 2011, and November 23, 2011.  (*Id.*).

Plaintiff was terminated effective April 30, 2012.  (Doc. 38-17, p. 2).

On July 9, 2012, Defendant hired Emily Rex (then 23 years-old) as a full-time ultrasound technician.  (Doc. 38 ¶ 92).[4]

Plaintiff commenced this action with the filing of a Complaint on July 9, 2013, asserting a single count of age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA").  Defendant answered the complaint on September 20, 2013.  (Doc. 15).  The instant Motion for Summary Judgment was filed by Defendant on September 29, 2014.  (Doc. 37).  The Motion has been fully briefed (Docs. 39, 43, 45) and is ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the

---

[4] Ms. Dorrough testified that two other ultrasound technicians were also hired following Plaintiff's discharge, although their ages are not of record.  (Doc. 43-8, p. 20).  Plaintiff highlights that Defendant made no mention of these additional hires in its answers to Plaintiff's interrogatories.  (Doc. 43-9, p. 6).

governing law.  *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence.  *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, and upon satisfaction of that burden, the non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial.  *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  In advancing their positions, the parties must support their factual assertions by citing to specific parts of the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. Civ. P. 56(c)(1).

A court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh*

*Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)).  Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 247-48) (internal quotation marks omitted).

## III.   DISCUSSION

The ADEA prohibits employers from discharging employees who are 40 years-old or older because of their age.  29 U.S.C. §§ 623(a)(1), 631(a).  To prevail on an age discrimination claim, a plaintiff must show that her age "actually motivated" and "had a determinative influence on" the employer's decision to terminate her.  *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 (3d Cir. 2002) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)) (internal quotation marks omitted); *see Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) ("[T]he plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action.").  A plaintiff may meet this burden by presenting either direct evidence of discrimination or indirect evidence of discrimination, tested using the familiar *McDonnell Douglas* burden-shifting framework.  *See Fakete*, 308 F.3d at 337-38 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

11

The *McDonnell Douglas* analysis first requires the employee to make a prima facie showing of discrimination. *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009). Establishment of a prima facie case effectively creates a presumption that the employer unlawfully discriminated against the employee. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). In an ADEA case, the employee must demonstrate that: (1) she is over 40 years-old; (2) she is qualified for her position; (3) she suffered an adverse employment decision; and (4) her replacement was sufficiently younger to permit a reasonable inference of age discrimination. *See Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004). If the employee presents such a case, the evidentiary burden shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse decision. *See Smith*, 589 F.3d at 691. If the employer satisfies this requirement, the burden shifts back to the employee to demonstrate that the employer's articulated reason was pretextual and a mask for intentional discrimination. *See id.* To be clear, only the burden of production shifts, with the burden of persuasion remaining at all times with the employee. *See id.* "Because the prohibition against age discrimination contained in the ADEA is similar in text, tone, and purpose to that contained in Title VII, courts routinely look to law developed under Title VII to guide an inquiry under ADEA." *Brewer v. Quaker State Oil Refining Corp.*, 72

F.3d 326, 330 (3d Cir. 1995).

### A.    Prima facie case

Defendant concedes that Plaintiff has established prongs one and three of her prima facie case, because she suffered an adverse employment action – termination – and  was over 40 at the time.  However, Defendant maintains that Plaintiff cannot show that she is qualified for her position or that she was replaced by someone substantially younger.

To be qualified for her position, a plaintiff must have been "performing [her] job at a level that met [her] employer's legitimate expectations" at the time of termination.  *Detz v. Greiner Indus., Inc.*, 346 F.3d 109, 119 (3d Cir. 2003) (citation and internal quotation marks omitted).  Qualifications should be evaluated under an objective standard.  *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995).  A plaintiff need show only basic qualification to satisfy the prima facie case requirement.  *See* 8-135 LARSON ON EMPLOYMENT DISCRIMINATION § 135.03 ("[I]t is necessary at this stage only to show basic qualification; the plaintiff is not required to show that he or she was the most qualified for the job."); BARBARA T. LINDEMANN, PAUL GROSSMAN, C. GEOFFREY WEIRICH, EMPLOYMENT DISCRIMINATION LAW 12.X.B.1.a (5th ed. 2012) ("Most courts require only a basic showing of qualifications at the prima facie case stage.  A plaintiff need only

establish that he met the minimum requirements of the position, or that he was meeting the 'reasonable' or 'legitimate' expectations of the employer at the time of the adverse action.").

Plaintiff has demonstrated her qualification for her position for purposes of proving a prima facie case, a burden which is "not intended to be onerous." *Sempier*, 45 F.3d at 728. Plaintiff earned the requisite degrees and certifications for her job as an ultrasound technologist and worked in the field for over 25 years. Further, according to her 2011 performance review, she generally "effectively [met the] performance expectations" of her position. *Accord Brewer*, 72 F.3d at 330 (the plaintiff was qualified for the position of sales representative where he held the job for 23 years and received overall evaluations equivalent to "competent" by company standards).

Turning to whether Plaintiff was replaced by someone substantially younger, Plaintiff has proffered that Emily Rex was hired as a full-time ultrasound technologist on July 9, 2012, less than two and a half months after Plaintiff's termination. (Doc. 38, ¶ 92). At the time she accepted the position, Ms. Rex was 23 years-old. (*Id.*). Defendant argues against this element of Plaintiff's prima facie case on the ground that Defendant originally intended to utilize Ms. Rex on an "as needed" basis and only hired her full-time because demand was so great.

14

We flatly reject this argument.  The fact remains that Defendant hired a

significantly younger person within months of firing Plaintiff, and the new

employee assumed responsibilities previously belonging to Plaintiff.  *Accord*

*Sempier*, 45 F.3d at 729-30 (prima facie case satisfied where the plaintiff's former

job functions were undertaken by employees who were four and 10 years younger

than him).  How this scenario could be perceived as anything but replacing

Plaintiff with a substantially younger person strains reason.   In light of these facts,

Plaintiff  has sufficiently shown that she was replaced by a substantially younger

person.

Having found that Plaintiff has carried her initial burden to show that she

was fired "under circumstances that give rise to an inference of unlawful

discrimination," *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999)

(citation and internal quotation marks omitted), the burden now shifts to Defendant

to produce evidence of a legitimate, nondiscriminatory reason for Plaintiff's

discharge.

### B.    Legitimate, nondiscriminatory reason

An employer may rebut the presumption of discrimination created by the

prima facie case by forwarding a legitimate, nondiscriminatory reason for the

adverse employment action.  *See Burdine*, 450 U.S. at 254.  The employer does so

"by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable [action]." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)) (internal quotation marks omitted). The asserted nondiscriminatory rationale need not be shown to have actually motivated the termination. *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005) (citing *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000)). As stated, this is a burden of production, not persuasion. *See Smith*, 589 F.3d at 691. If the employer bears its burden, the presumption of discrimination drops from the case. *See Stewart v. Rutgers, The State Univ.*, 120 F. 3d 426, 432 (3d Cir. 1997).

Here, Defendant has amply adduced that Plaintiff was terminated based on job performance. In the 16 months preceding her termination, Plaintiff received multiple warnings and disciplinary citations for such problems as substandard work product, unprofessional conduct, and failure to adhere to hospital protocols.

Although Plaintiff does not dispute that Defendant has carried its burden (Doc. 43, p. 13), she does maintain that many of the personnel documents proffered by Defendant constitute inadmissible hearsay. (She likewise lodges numerous hearsay objections to Defendant's recitation in its Statement of Facts. (Doc. 44).) Plaintiff's argument is unavailing because the disputed internal

16

documents are not being offered to prove the truth of what they assert. *See* FED. R. EVID. 801 (hearsay is a statement that the declarant does not make while testifying at the present hearing and is offered in evidence "to prove the truth of the matter asserted in the statement"). "Rather, such documents are relevant and admissible because they help explain . . . the employer's conduct." *Wolff v. Brown*, 128 F.3d 682, 685 (8th Cir. 1997); *see also Kaur v. NYC Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 323 (S.D.N.Y. 2010) (personnel documents "are being offered to show the state of mind of Defendant's representatives in making various employment decisions with regard to Plaintiff; the truth of the assertions in the documents is irrelevant"). As stated by the Second Circuit Court of Appeals,

> [i]n a discrimination case, . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what "motivated the employer," *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716 . . . (1983) (emphasis added) (internal quotations omitted); the factual validity of the underlying imputation against the employee is not at issue.

*McPherson v. NYC Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006). Similarly here, Plaintiff's employee documents are being offered to explain Defendant's reasoning for discharging Plaintiff and, as such, are admissible.

We thus proceed to the final step of the *McDonnell Douglas* analysis, considering whether the defendant's asserted rationale was pretextual.

### C.     Pretext

After an employer has proffered a legitimate, nondiscriminatory reason for

the adverse action, the burden falls back to the employee to demonstrate the

insincerity of the employer's asserted rationale, disguising a discriminatory

purpose.  *See Reeves*, 530 U.S. at 147 (A summary judgment motion should be

denied where "the trier of fact can reasonably infer from the falsity of the

explanation that the employer is dissembling to cover up a discriminatory

purpose.").  To avoid summary judgment, a plaintiff must point to "such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

the employer's proffered legitimate reasons for its action that a reasonable

factfinder *could* rationally find them unworthy of credence."  *Kautz*, 412 F.3d at

467 (quoting *Fuentes*, 32 F.3d at 765) (internal quotation marks omitted; emphasis

in original).  Because the gravamen of the dispute is whether discriminatory

animus actually prompted the employer's action, a plaintiff cannot merely show

that the employer's decision was wrong or mistaken.  *See Stewart*, 120 F.3d at 432

(quoting *Fuentes*, 32 F.3d at 765).  For whether the employer is "wise, shrewd,

prudent, or competent" is of no moment.  *Id.* (quoting *Fuentes*, 32 F.3d at 765).

Rather, a plaintiff must show that the employer's articulated reason is not to be

believed or that it is more likely than not that an invidious discriminatory purpose

motivated the employer's action.  *See Anderson*, 621 F.3d at 271 (citing *Fuentes*,

32 F.3d at 764).

Plaintiff first argues that any disciplinary incidents occurring prior to 2011

are too attenuated to be considered as prompting her termination.  She references

the perceived "significant and genuine hearsay issues" with her personnel file,

citing, for example, that the physicians who were purportedly dissatisfied with her

work were not identified.  (Doc. 43, p. 14).  Plaintiff also specifically notes that the

Associate Corrective Action Plan of November 23, 2011, included no

recommended corrective action.  (Doc. 38-12, p. 2).  In addition, she characterizes

Defendant's explanation of the circumstances of Ms. Rex's hiring as "inadequate,"

noting that Defendant stated its intent to hire Ms. Rex on an as-needed basis but

hired her full-time instead.  (Doc. 43, p. 15).

Plaintiff has failed to show that Defendant's proffered reason for Plaintiff's

termination is a pretext for age discrimination.  Her hearsay argument is ineffective

for the reasons explained infra.  To the extent Plaintiff is attempting to show that

the disciplinary and performance citations were unwarranted or false – and thus a

pretext for discrimination – her own admissions belie that conclusion.  For

example, although Plaintiff testified that she believed the November 23, 2011,

write-up was "unwarranted" (Doc. 43-3, p. 9), her written response offers an

explanation for, rather than a denial of, the cited conduct.  (Doc. 38-12, pp. 5-6; *see also* Doc. 43-3, p. 15 (Plaintiff's testimony that she did not believe that her supervisor provided false information to support disciplinary action against Plaintiff)).  Furthermore, in her deposition testimony, Plaintiff does not contravene any of the disciplinary citations on the grounds that they were fabricated.  *Cf. Barker v. Ellington Bd. of Educ.*, No. 12-cv-313, 2013 WL 6331159, at *12 (D. Conn. Dec. 5, 2013) (finding pretext and denying summary judgment where employer's performance evaluations of employee where internally inconsistent and contradictory).  Nor does she point to specific evidence that she was being targeted while others not in the protected class were not.   The circumstances surrounding the hiring of Ms. Rex are unrelated and irrelevant to Defendant's rationale that Plaintiff was fired because of poor performance and do not raise a triable dispute of fact.

Having found that Plaintiff has failed to present facts raising a reasonable inference that Plaintiff was *not* fired because of poor performance, we grant summary judgment in favor of Defendant.[5]

---

[5] Defendant also argues that Plaintiff's age discrimination claim fails under the Pennsylvania Human Relations Act, 43 Pa. C. S. § 951 *et seq.* ("PHRA").  Although Plaintiff's Complaint does not appear to assert an allegation pursuant to the PHRA, we note that the same legal standard applies to both ADEA and PHRA claims. *See Kautz*, 412 F.3d at 466 n.1.  Thus, Plaintiff could not obtain relief under the state statute, either.

## IV.    CONCLUSION

In sum, Plaintiff has failed to produce evidence to show that she was terminated on account of her age.  Therefore, Defendant is entitled to summary judgment.

An appropriate Order shall issue.